UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JON R. ADAMS, | |
| Plaintiff | |
| v. | **1:19-cv-547-GZS** |
| MATTHEW MAGNUSSON, et al, | |
| Defendants | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Under Fed. R. Civ. P. 56 and Local Rule 56, Defendants Averill and LeClair move for summary judgment on Plaintiff Adams' claims, because there are no material factual questions precluding judgment and because Defendants are entitled to judgment as a matter of law.

## INTRODUCTION

There is no dispute that Adams' right eye was wounded when another prison resident (Uffelman) came at Adams with two ballpoint pens in the middle of the night in September 2019. Luckily, Adams' eye has completely recovered. The central question before the Court now on summary judgment is whether the failure of Defendants to anticipate the incident constituted "deliberate indifference." To have been deliberately indifferent, Defendants must have "know[n] of and disregard[ed] an excessive risk to inmate safety." *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994). They must have consciously "drawn the inference" between the facts and a substantial risk. *Id*. Here, the undisputed facts do not show conscious disregard for Adams' safety or that Defendants drew the required inference. Immediately after the incident, Adams is on video questioning why Uffelman did it, stating, "All I can think of is I was snoring loud or something, I snore loud," and "All because I stuck up for this gentlemen earlier, it has to have been." Defendants' Statement of Material Fact (DSMF) ¶ 89. Even the third roommate said he was "Surprised." *Id.* ¶ 80. Defendant Averill, who had intervened in a squabble between Uffelman and Adams earlier that evening, is seen on video asking Uffelman why he did it when Averill had thought "we were good" at the end of the prior interaction with the two residents. *Id.* ¶ 85. Not even Adams anticipated what happened. Defendants LeClair and Averill did not know of the risk, either, nor disregard it, and thus they are entitled to summary judgment on the deliberate indifference claim. Because Defendants are also statutorily immune from Adams's negligence claim, the Court should enter judgment for Defendants.

**STATEMENT OF FACTS**

**I.     Background**

Adams is a resident in the custody of the Maine Department of Corrections (MDOC), who is due to be released in August 2021. *Id.* ¶ 1. Defendant LeClair is an officer who was working in the infirmary at Maine State Prison in 2019. *Id.* ¶ 2. Defendant Averill was working as a sergeant covering the infirmary at that time. *Id.* ¶ 3. In August 2019, Adams was housed in the infirmary because he had jumped off the second tier railing at Maine Correctional Center. *Id.* ¶ 4. Officers put mattresses underneath Adams to break his fall, but he still broke bones and needed surgery. *Id.* ¶ 5. When Adams was discharged from the hospital, he was housed in the infirmary. *Id.* ¶ 6.

In the infirmary, there is one three-person room and four single rooms, and thus the maximum capacity of the infirmary is seven residents. *Id.* ¶ 8. The three-man room in the infirmary, where the incidents at issue occurred, is a large room with three hospital beds and is painted to look like a log cabin. *Id.* ¶ 9. In the infirmary, each resident has a TV. *Id.* ¶ 10. To avoid the TVs bothering other residents in the three-man room, the residents use headphones. *Id.* ¶ 11. If a resident does not have headphones, the infirmary provides them. *Id.* ¶ 12. Residents are supposed to wear headphones in the three-man room, but Adams frequently flouted that requirement. *Id.* ¶ 13.

**II.    Events of August 26, 2019.**

On August 26, 2019, Officer Reid (who is not a defendant) made an entry into MDOC's computerized offender information system (CORIS), noting that Uffelman approached Officer Reid and stated that Adams had stolen a pair of headphones from him. *Id.* ¶ 14.[1] Officer Reid verified that the headphones Adams had were ones the nurse had given him. *Id.* ¶ 15. Officer Reid

---

[1] The CORIS note is admissible under Fed. R. Evid. 803(6) as a record of a regularly conducted business activity. The statements in the CORIS note are hearsay, except for Adams' statements, which are party admissions under Fed. R. Evid. 801(d)(2). The statements by Uffelman to the nurse to Officer Reid contain multiple layers of hearsay, and the Court may not consider them for their truth but may consider them for their effect on the listeners.

wrote that he "explained to both inmates [that he] expect[ed] them to be civil and act properly." *Id.* ¶ 16. Officer Reid also wrote that about half an hour later (at 1320) "Uffelman . . . informed [Nurse Crystal] that Adams is a Cell Thief and I [Uffelman] am going to kill him." *Id.* ¶ 17. According to Officer Reid's report, Uffelman told Nurse Crystal that Adams retorted "should I sleep with one eye open?" to which Uffelman responded "yes." *Id.* ¶ 18. Officer Reid noted in the logbook that "I/M Uff[el]man (2370) accuses I/M Adams (13553) of stealing headphones[.]"[2] *Id.* ¶ 19. Uffelman was moved out of the room. *Id.* ¶ 20. Adams testified at deposition that he "didn't really" react when Uffelman said he was going to kill Adams and that Adams "let the nurse handle it." *Id.* ¶ 21. According to Adams, Uffelman was sitting in his wheelchair at the time. *Id.* ¶ 22.

There is a process for a resident to fill out a form requesting a "keep separate," by which the resident will be kept separate from another resident, to accommodate a safety concern. *Id.* ¶ 23. For example, after the incident with Uffelman on September 15, Adams completed that form and a "keep separate" was put into place, so that they would not be housed together going forward. *Id.* ¶ 24. The prison must investigate "keep separate" requests closely, because residents manipulate the process. *Id.* ¶ 25. Adams admits that residents use this process to get someone out of the unit that the resident may not like and that Adams himself has done this. *Id.* ¶ 26. Adams has also threatened to put "keep separates" on other residents out of anger. *Id.* ¶ 27. Adams admits that after the August 26 interaction with Uffelman, there was no "keep separate" between Adams and Uffelman. *Id.* ¶¶ 28, 29.

After August 26 but before September 14, Adams told Officer McArthur that Adams had made peace with Uffelman. *Id.* ¶ 30. Adams suggested that Uffelman be moved back into the three-

---

[2] The logbook is admissible under Fed. R. Evid. 803(6) as a record of a regularly conducted business activity.

man room and that another resident with whom Adams was having disagreements (Resident A.) be moved out. *Id.* ¶ 31.

### III.    Events of September 14 and 15, 2019.

About three weeks later, on September 14, Defendant LeClair was working in the infirmary. *Id.* ¶ 32. He needed a space in the infirmary for a resident coming in from the hospital who needed a single room to avoid infection. *Id.* ¶ 33. The three single rooms in the infirmary were occupied, and Uffelman was the only one appropriate to house with other residents. *Id.* ¶ 34. Sometime before 4 p.m., Defendant LeClair told Adams and the other resident assigned to the three-man room (Resident B.) that Uffelman would be moving into the empty bed. *Id.* ¶ 35. Adams objected to the move. *Id.* ¶ 36. Adams alleges that he told Defendant LeClair about the prior threat to his life, that Defendant LeClair would have known about the CORIS note, and that Adams cited the note in his conversation with LeClair. Compl. ¶ 22, DSMF ¶ 48. Defendant LeClair is adamant that he did not know about Officer Reid's prior CORIS note.[3] DSMF ¶¶ 37, 48. Defendant LeClair is also adamant that Adams did not say anything about a threat to kill him, or LeClair would have investigated further, and if the threat was credible, he would have put Adams (and potentially also Uffelman) on "emergency observation status," alone and secure in a single cell, or taken one or both of them to another unit or segregation. *Id.* ¶ 38.

Defendant LeClair remembers Adams objecting to Uffelman moving in, which was not surprising, given that Adams complained to LeClair and Officer McArthur daily about a number of issues. *Id.* ¶¶ 39, 41. Adams admits that he was "attitudish" with LeClair. *Id.* ¶ 40. Adams had issues with multiple staff and with all of his roommates in the infirmary, due to relatively minor

---

[3] Each day, hundreds of notes are entered into CORIS. DSMF ¶ 49. For example, in June and July 2019 alone, Adams had 25 CORIS notes. *Id.* ¶ 50. Defendant LeClair does not read every CORIS note about infirmary residents. *Id.* ¶ 51.

issues. *Id.* ¶ 41. For example, Defendant LeClair documented Adams and Resident A. squabbling, writing "I informed prisoner Adams and [Resident A.] that they both needed to find a way to coexist and the complaints they have about each others' rustling about, coughing, snoring, sleeping habits, loud TVs and lack of respect for one another were petty on the grander scale of things." *Id.* ¶¶ 42-43. Resident A. is the person Adams suggested that Officer McArthur move out so that Uffelman could move in, after August 26 but before September 14. *Id.* ¶ 44.

Regardless of what Adams and LeClair actually said to each other regarding Uffelman on September 14, LeClair did move Uffelman into the room. *Id.* ¶ 45. Hospice worker residents who assist in the infirmary wheeled Uffelman in, and Adams went back to watching TV. *Id.* ¶¶ 46- 47.

Defendant LeClair left the infirmary at about 6 p.m. on September 14. *Id.* ¶ 52. Officer McArthur was working in the infirmary that night. *Id.* ¶ 53. At about 7 p.m.,[4] Uffelman took headphones from the third roommate (Resident B.),[5] and Adams was dissatisfied with the way Uffelman did it. *Id.* ¶ 54. According to Adams, Adams "stuck up" for Resident B, stating "if you're bullying him out of his headphones, please stop" and "you just tried pulling the same thing with me 19 days ago" DSMF ¶¶ 55-56.

Hearing Uffelman and Adams, Officer McArthur responded to the three-man room and consulted with Defendant Averill, who suggested talking to the residents and trying to work it out. *Id.* ¶ 57. Defendant Averill and Officer McArthur went to the three-man room together to discuss the situation with Adams and Uffelman. *Id.* ¶ 58. According to Officer McArthur, Adams called Uffelman a bully. *Id.* ¶ 59. According to Defendant Averill and Officer McArthur, Adams did not tell them about the August 26 CORIS note or any threat on Adams' life. *Id.* ¶¶ 59, 65.

---

[4] Adams alleges that this conversation occurred at 10 p.m. (Compl. (ECF No. 1-1 p. 7) ¶ 26), but Defendant Averill and Officer McArthur recall it being close to the beginning of the shift (near 7 p.m.). The exact time is immaterial.
[5] Officer McArthur had borrowed the headphones from Uffelman the night before, because Uffelman was in a single room at the time and could listen to his TV without headphones. DSMF ¶ 97.

Defendant Averill tried to mediate the headphones dispute and got a spare set of headphones so that each of the three roommates had a pair. *Id.* ¶ 60. At the end of the conversation, Defendant Averill asked Adams and Uffelman if everything was good between them and they indicated they were good. *Id.* ¶ 61. On the way out of the room, Officer McArthur asked Uffelman, "Are we done for the night," and Uffelman said he was, signaling to McArthur that they had resolved their issue. *Id.* ¶ 63. The three residents then went back to watching TV. *Id.* ¶ 64.

Adams was not worried about standing up to Uffelman, because Uffelman was "an older guy, and [Adams] really didn't think that there's much he could do to [Adams]." *Id.* ¶ 66. At deposition, Adams stated that he thought, "well he's an old man and what can he do to me[?]" *Id.* ¶ 67. Adams did not think that standing up to Uffelman "would push him to a level to where he would stab [Adams] in [his] sleep." *Id.* ¶ 68.

Adams alleges that Defendant Averill told the two residents to "knock the shit off" and "if you guys have anything you want to say to each other, say it now, get it off your chest while I'm standing here." *Id.* ¶ 69. Defendant Averill disputes that he said those things. Defendant Averill was trying to mediate between the residents, not escalate things, and would not have used the word "shit" or the phrase "get it off your chest." *Id.*

Adams states that Defendant Averill said "if I have to come back here, someone's going to seg" (*Id.* ¶ 70), but when Adams was asked at deposition why he did not take him up on going to segregation to protect himself, Adams stated "I just didn't. I guess I could have but I didn't" (*id.*) and, "You know, you're right. I could have taken him up on that" (*id.* ¶ 71). Adams stated that he "didn't think it would work out okay but [also that he] did." *Id.* ¶ 72. He could have said "fine, I'll go to seg right now but [he] just wanted to finish watching [his] show and [he] still wanted to be in the [3-man] room" and he "took a chance, the risk of staying in the room." *Id.* Adams "never

6

would have thought in a million years [Uffelman] would have did what he did[.]" *Id.* ¶ 73. Adams admits that he did not ask to talk to Defendants Averill or LeClair in private about his alleged safety concern, even though he could have. *Id.* ¶ 98.

After Averill and McArthur left the room, all three roommates went back to watching TV. *Id.* ¶ 64. Adams fell asleep at 1 a.m., with his TV on but his headphones out. *Id.* ¶ 74. At about 3:30 a.m., Defendant Averill and Officer McArthur responded to the three-man room and saw Uffelman in the middle of the room holding two ballpoint pens. *Id.* ¶ 75. Defendant Averill drew his taser and told Uffelman to drop the pens, and he complied. *Id.* ¶ 76. Adams said of the officers responding, "You guys came in quick."[6] *Id.* ¶ 77.

Medical staff immediately came in to evaluate Adams.[7] *Id.* ¶ 78. Defendant Averill can be heard on Video 1 telling medical personnel to do what they need to do to help Adams and reporting to his supervisor what happened. *Id.* ¶ 79. Averill stated, "Mac [McArthur] and I both popped the door together. Uffelman was standing in front of us . . . he had both pens with tips out. I drew my taser . . . I told him to drop the weapons. He complied immediately. . . . [we] brought [Uffelman] out here . . . [Adams] sat up and said he got stabbed." *Id.* Officer McArthur asked the third roommate (Resident B.), who had been there throughout the day, how he was doing, and he responded that he was surprised.[8] *Id.* ¶ 80.

Averill had Uffelman removed from the room and taken to a cell in segregation, where Averill interviewed him. *Id.* ¶ 81. On video, Defendant Averill asked Uffelman, "Richard, what's

---

[6] Video footage from Defendant Averill's body camera is being submitted to the Court under seal. (Ross Decl. Ex. B (Video 1).) Camera footage that was taken by a handheld camera when Defendant Averill interviewed resident Uffelman is also being submitted under seal. (Ross Decl. Ex. C (Video 2).) As discussed in the motion to seal, sealing is appropriate to protect the privacy of non-parties, including the third roommate. Adams has had two opportunities to view these videos and will have another opportunity after receiving the motion for summary judgment.

[7] Adams and Averill use the phrase "stabbed," but Uffelman had ballpoint pens, not a knife.

[8] This statement is excepted from the hearsay rule as a present sense impression, excited utterance, and statement of then-existing mental/emotional condition. Fed. R. Evid. 803(1), (2), and (3).

that about? what'd you stab him for?" and Averill said he "thought everybody agreed we were good? I got you guys an extra pair of headphones . . . so what happened?" *Id.* ¶ 82. In response, Uffelman stated that Adams had threatened his family members. *Id.* ¶ 83. Defendant Averill asked Uffelman on video when Adams made those threats, and Uffelman says it was "after we spoke" (referring to the conversation at 7 p.m., regarding headphones). *Id.* ¶ 84. Defendant Averill replied, "I thought we were good?" and Uffelman responded, "I thought so too." *Id.* ¶ 85. Uffelman said that after Averill left, "He [Adams] was talking, and I [Uffelman] was talking back" and then Adams threatened Uffelman's family. *Id.* ¶ 86. Adams denied making the threat. *Id.* ¶ 87.

When Averill interviewed Adams, Adams stated that he did not know why Uffelman would do this and asked "Why would he do that?," which Defendant Averill documented in his report at the time. *Id.* ¶ 88. On video, Adams wondered out loud why Uffelman would do this, stating, "I was sound asleep. All I can think of is I was snoring loud or something. I snore loud" and "All because I stuck up for this gentlemen earlier, it has to have been." *Id.* ¶ 89.

Adams was taken to the emergency room at PenBay Hospital and then to Maine General, where he saw an eye specialist. *Id.* ¶ 91. Adams was discharged from the hospital the same morning he went in and returned to the infirmary. *Id.* ¶ 92. As a result of the incident, Adams' had an eye injury, which Plaintiff's eye specialist stated would have to fix itself. *Id.* ¶ 93. Adams' eye has fully recovered. *Id.* ¶ 94.

## STANDARD OF REVIEW

### I.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To defeat a summary judgment motion, the non-moving party must demonstrate "through submissions of evidentiary

quality, that a trialworthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## II.   Deliberate Indifference Standard.

Prison officials must take reasonable measures to guarantee residents' safety from attacks by other residents. *See Farmer*, 511 U.S. at 833; *Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 14 (1st Cir. 1990). But not every injury a resident suffers at the hands of another resident is actionable. *Farmer*, 511 U.S. at 834; *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002). To prevail, the plaintiff must show that the conditions of incarceration pose a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. And Plaintiff must also meet the subjective requirement: that the defendants had a sufficiently culpable state of mind, by "know[ing] of and disregard[ing] an excessive risk to inmate health or safety." *Id.* at 837. Each defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not show deliberate indifference. *Id.* at 838.

"[P]rison officials who actually knew of a substantial risk . . . may be found free of liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002). The Court must look to "the totality of the circumstances as understood by prison officials at the time" to determine whether defendants "fail[ed] to take reasonable measures to avert potential harm." *Burrell*, 307 F.3d at 8. The inquiry into the reasonableness of the prison officials' actions "incorporates due

regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* (citing *Farmer*, 511 U.S. at 845 (internal quotations omitted).)

## ARGUMENT

### I.    Defendant Averill Responded Reasonably to the Situation and Thus Was Not Deliberately Indifferent.

Defendant Averill responded reasonably to what he saw between Adams and Uffelman and thus cannot be liable for deliberate indifference. *Farmer*, 511 U.S. at 844; *Burrell,* 307 F.3d at 8. The evidence shows that on September 14, 2019, at about 7 p.m., Defendant Averill and Officer McArthur went to the three-man room to try to mediate a dispute between the room's residents over headphones. DSMF ¶¶ 58, 60. Uffelman had taken back headphones from Resident B, which Officer McArthur had borrowed from Uffelman and given to Resident B the night before. *Id.* ¶¶ 54, 97. Adams was upset with the way Uffelman went about taking the headphones and "stuck up" for Resident B (as Adams puts it). *Id.* ¶¶ 54-55. Defendant Averill went and got another pair of headphones (so that each roommate had one), and asked if everything was good between them. *Id.* ¶¶ 60-61. On the way out of the room, Officer McArthur asked Uffelman, "Are we done for the night," and Uffelman said he was, signaling to McArthur that they had resolved their issue. *Id.* ¶ 63. This was consistent with Adams' prior statement to Officer McArthur that Adams had made peace with Uffelman since the August 26 interaction and with Adams recently suggesting to McArthur that Uffelman move back in the room so another resident could be moved out. *Id.* ¶¶ 30-31. On September 14, after Defendant Averill and Officer McArthur left, the three residents went back to watching TV, and nothing transpired between Adams and Uffelman for the next six to seven hours. *Id.* ¶¶ 64, 75. At about 3:30 a.m., Defendant Averill and Officer McArthur responded to the three-man room and saw Uffelman standing and holding two ballpoint pens. *Id.* ¶ 75. Averill drew his taser and told Uffelman to drop the pens, and Uffelman complied. *Id.* ¶ 76.

10

What happened next (and the immediate reactions of all involved) is captured on video. Defendant Averill can be heard on video telling medical personnel to do what they need to do to help Adams, and Defendant Averill sent Uffelman to segregation. *Id.* ¶¶ 79, 81. When Defendant Averill interviewed Uffelman (approximately 10 minutes afterwards), Defendant Averill asked Uffelman, "What's that about? what'd you stab him for?" and Averill said he "thought everybody agreed we were good? I got you guys an extra pair of headphones . . . so what happened?" *Id.* ¶ 82. In response, Uffelman stated that Adams had threatened his family. *Id.* ¶ 83. Defendant Averill asked Uffelman when Adams made that threat, and Uffelman said it was "after we spoke" (referring to the 7 p.m. conversation with Averill and McArthur). *Id.* ¶ 84. Defendant Averill stated, "I thought we were good?" and Uffelman responded, "I thought so too." *Id.* ¶ 85. Regardless of whether Adams actually threatened Uffelman's family, the record (including the video evidence) shows that Defendant Averill did not "draw the inference" between the facts of the situation during the 7 p.m. discussion and a substantial risk of harm to Adams. *Farmer,* 511 U.S. at 837. Defendant Averill got a third set of headphones, mediated the dispute, got assurances that everyone was "good," and left the men to continue watching TV. DSMF ¶¶ 60, 61, 64. These facts show that Defendant Averill acted reasonably in response to the dispute and thus was not deliberately indifferent. *Farmer,* 511 U.S. at 844.

Adams' own statements after the incident, captured on video, show that the incident was unexpected and belie the link to the August 26 interaction between Uffelman and Adams. Immediately after the incident, Adams stated, "I was sound asleep," and "All I can think of is I was snoring loud or something, I snore loud." DSMF ¶ 89. Adams also said it was "[a]ll because I stuck up for this gentlemen earlier, it has to have been." *Id.* On video, Defendant Averill described the situation to his supervisor, explaining that he saw Uffelman standing in the middle of the room

and that Adams reported he'd been stabbed. *Id.* ¶ 79. Nobody brought up the August 26 threat on either video. The videos show that neither Adams nor Averill anticipated Uffelman's actions or linked them to the August 26 issue between Uffelman and Adams. These undisputed facts show that Defendant Averill was not aware of facts from which to draw an inference of substantial risk of harm, nor did Averill draw that inference. *Farmer,* 511 U.S. at 837. Thus, Defendant Averill cannot be found liable for deliberate indifference. Even evaluating the record in the light most favorable to Plaintiff Adams, Defendant Averill's behavior was reasonable "when considered within the context of what [he] knew." *Burrell*, 307 F.3d at 8. Because Defendant Averill acted reasonably given the circumstances, he was not deliberately indifferent. *Farmer,* 511 U.S. at 844.

## II.   Adams' Version of Events Does Not Create a Question of Fact That Would Defeat Summary Judgment.

Adams testified at deposition that during the 7 pm. conversation, Adams told Officer McArthur and Defendant Averill about the August 26 dispute and Uffelman's threat. DSMF ¶ 99. Officer McArthur and Defendant Averill both deny this (*id.*), and Officer McArthur in fact recalls Adams telling McArthur after the August 26 incident (but before September 14) that Adams had made peace with Uffelman and asking McArthur to move Uffelman back in the room so a third resident, whom Adams had issues with, could be moved out (*id.* ¶¶ 30-31).

In addition to being contradicted by Defendant Averill's declaration and non-party witness McArthur, the allegation by Adams that he informed Defendant Averill and Officer McArthur of Uffelman's August 26 threat is contradicted by everything Adams (and others) said on video after the incident. Immediately after, Adams said, "All I can think of is I was snoring loud or something, I snore loud" and "All because I stuck up for this gentlemen earlier, it has to have been." *Id.* ¶ 89. Adams did not say that he knew this would happen or that he had told anyone that Uffelman would make good on the threat from August. Similarly, Defendant Averill asked Uffelman immediately

after the incident "what happened" because Averill had thought "everybody agreed we were good" (*id.* ¶¶ 82, 85), which is inconsistent with Adams' claim that Defendant Averill knew of the August 26 threat. Even if Averill had known about the August 26 interaction, Averill's comments after the incident on September 15 show that he did not "draw the inference" between the facts as they existed and a substantial risk to Adams. At no point after the incident did Adams or Defendant Averill make any mention of the August 26 threat or Adams telling Averill about it, not when Averill asks Uffelman "what's that about? what'd you stab him for?" (*id.* ¶ 82); not when Defendant Averill said that he "thought everybody agreed we were good? I got you guys an extra pair of headphones . . . so what happened?" to Uffelman (*id.* ¶¶ 82, 85); nor when Defendant Averill briefed his supervisor (*id.* ¶ 79). Plaintiff cannot create a factual dispute to defeat summary judgment that is directly contradicted by the video evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Supreme Court has clearly stated that "visible fiction" cannot defeat summary judgment and that lower courts "should . . . view[] the facts in the light depicted by the videotape." *Scott*, 550 US at 380-81; *Siner v. Goings*, No. 14-CV-12578, 2015 WL 1867381, at *3 (E.D. Mich. Apr. 23, 2015) (holding that "video evidence substantiating one party's version of events can serve as controlling evidence at the summary judgment stage") (citing *Scott,* 550 U.S. at 380-81); *see also Shreve v. Franklin Cnty.*, 743 F.3d 126, 132 (6th Cir. 2014) ("[W]itness accounts seeking to contradict an unambiguous video recording do not create a triable issue.")

The First Circuit has stressed that "[t]he test for summary judgment is steeped in reality[,]" and Plaintiff must come forward with "evidence illustrating the factual controversy [that is not]

conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Medina-Munoz,* 896 F.2d at 8 (citations omitted). Here, the record and video evidence are clear that no one was expecting Uffelman to do what he did and that on video afterwards, neither Adams nor Averill connected the incident to the prior threat.

Even if Adams had told Officer McArthur and Defendant Averill about the August 26 threat, Officer McArthur recalls Adams asking him to move Uffelman back into his room between August 26 and September 14 (because Adams wanted another resident out). DSMF ¶ 31. According to Officer McArthur, Adams previously told him that he had made peace with Uffelman, and he wanted Uffelman as a roommate instead of Resident A., whom Adams admitted at deposition he had issues with over noise, headphones, and bodily functions. *Id.* ¶¶ 30, 43-44. And even if Adams disputes Officer McArthur's account, Adams testified at deposition that when Averill allegedly said "if I have to come back here, someone's going to seg[regation]," that Adams "could have said . . . fine, I'll go to seg right now but [Adams] just wanted to finish watching [his] show and [he] still wanted to be in the [3-man] room'" and that Adams "took a chance, the risk of staying in the room" (*id.* ¶ 72), because Adams thought, "well he's an old man and what can he do to me[?]" (*id.* ¶¶ 67, 73.) Adams admitted that he "never would have thought in a million years [Uffelman] would have did what he did[.]" *Id.* ¶ 73. Just as Adams never thought Uffelman would do that, neither did Defendant Averill. Defendant Averill acted reasonably in leaving Uffelman and Adams in the same room, given the totality of the circumstances. Adams' assertion that Defendant Averill knew of the August 26 threat does not make Defendant Averill's actions unreasonable or defeat summary judgment. Because Defendant Averill responded reasonably and did not have "an actual, subjective appreciation of risk . . . likened to the standard for determining

criminal recklessness[,]" he was not deliberately indifferent. *Burrell*, 307 F.3d at 8 (citation omitted); *Farmer,* 511 U.S. at 844.

### III.    Defendant LeClair Was Not Deliberately Indifferent.

Defendant LeClair moved Uffelman into the three-man room on September 14th, because a debilitated resident was coming in from the hospital and needed a single room to avoid infection. DSMF ¶¶ 33, 45. The three single rooms were occupied, and Uffelman was the only resident in one appropriate to be moved in with roommates. *Id.* ¶ 34.

Adams claims that Defendant LeClair was deliberately indifferent in placing Uffelman in the three-man room. Adams states that he told Defendant LeClair that "Uffelman was recently moved out [of the room] for threatening to kill [him]" and that Officer Reid logged the threat in CORIS and the logbook. (Adams Aff. (ECF No. 17-6) ¶¶ 8, 9.) However, it is undisputed that the logbook from August 26, 2019, simply states, "I/M Uff[el]man (2370) accuses I/M Adams (13553) of stealing headphones," and does not say anything about any threat.[9] DSMF ¶ 19. Defendant LeClair denies that Adams told him about the August 26 incident, and Defendant LeClair was not aware of the August 26 CORIS note. *Id.* ¶¶ 37, 38, 48. If Adams had mentioned a threat to kill him, LeClair would have investigated and, if warranted, moved one of the residents out to a single cell, another unit, or segregation, on emergency observation status. *Id.* ¶ 38. Defendant LeClair does remember Adams objecting to Uffelman moving in, which was not surprising, given that Adams complained to LeClair and Officer McArthur daily about a number of issues in the infirmary and was "attitudish" to LeClair at the time.[10] *Id.* ¶¶ 39, 40.

---

[9] The logbook entry at 13:28 on August 26 (LeClair Decl. Ex. A) is redacted because it relates to an unrelated resident moving in from another part of the prison. Other residents' names in the logbook are redacted to protect their privacy. Equipment used by officers on shift has also been redacted, to protect the security of the unit.

[10] Adams had issues with multiple staff and roommates in the infirmary, due to relatively minor issues, such as TV volume, use of headphones, and bodily functions. DSMF ¶¶ 41-43. For example, Defendant LeClair documented

Regardless of the actual content of the conversation between Adams and LeClair, Adams admits that there was no "keep separate" between him and Uffelman[11] at the time that Officer LeClair moved Uffelman into the three-man room and that Adams felt it was safe to stick up for the third roommate later that day. DSMF ¶¶ 29, 66. Adams at no time asked to be moved to segregation, and did not ask to speak to Defendants LeClair or Averill privately about his alleged safety concern. DSMF ¶¶ 28-29, 70-71, 98. The undisputed facts show that Uffelman was wheeled into the three-man room in his wheelchair, and Adams went back to watching TV. *Id.* ¶¶ 45-47. Defendant LeClair left the infirmary at 6 p.m. *Id.* ¶ 52. As discussed above, at about 7 p.m., Defendant Averill and Officer McArthur intervened in another dispute about headphones, which those officers believed resolved the issue. *Id.* ¶¶ 54, 57-58, 60. The three roommates then went back to watching television. *Id.* ¶ 64. Adams fell asleep at about 1 a.m., and there was no further incident until about 3:30 a.m., when Uffelman came at Adams with the two pens. *Id.* ¶¶ 74-75. As discussed above, neither of the Defendants, and not even Plaintiff, made the link between the 3:30 a.m. incident and Uffelman's threat to Adams on August 26. Adams' statements on video immediately after the incident show that Adams linked what Uffelman did to Adams' snoring or sticking up for the third roommate at 7 p.m., not prior interactions with Uffelman. *Id.* ¶ 89. Given these facts, Defendant LeClair cannot be found to have acted with a state of mind "akin to criminal recklessness" in moving Uffelman into Adams' room to make room for the sick resident coming in from the hospital. There is also independent evidence from Officer McArthur that the August 26 incident between Uffelman and Adams had been resolved. *Id.* ¶ 30. As discussed above,

---

Adams and Resident A. squabbling, writing "I informed [them] that they both needed to find a way to coexist and the complaints they have about each others' rustling about, coughing, snoring, sleeping habits, loud TVs and lack of respect for one another were petty on the grander scale of things." *Id.* ¶ 43.

[11] Adams admits that he has tried to manipulate the housing of other residents this way and thus the prison must investigate "keep separates" closely. DSMF ¶¶ 25, 26.

Adams's statements after the incident are telling. He made no mention of the August 26 threat and instead attributed what Uffelman had done to Adams' snoring or sticking up for Resident B. a few hours earlier. *Id.* ¶ 89.

Even if, despite the video evidence, the Court credits Adams's statement that he told LeClair about the August 26 threat, Defendant LeClair would still have acted reasonably. Even taking Plaintiff's assertions as true, the Court must consider that they are "not the only information [prison] officials had" and that officials may have received information which "counteracted" Plaintiff's concerns and "influenced the officials' response to the risks." *Burrell*, 307 F.3d at 8-9. Here, Defendant LeClair needed the single room for another resident, and Adams admits that there was no "keep separate" between them, which LeClair verified on September 14. DSMF ¶ 28. Even Adams admits that Adams thought "well he's an old man and what can he do to me[?]" Adams was being "attitudish" (DSMF ¶ 40), and Defendant LeClair knew that Adams voiced his disagreement with most actions taken by staff in the infirmary and had many prior disagreements with roommates (*id.* ¶¶ 39, 41, 43). Given all of this information, it was not unreasonable for Defendant LeClair to move Uffelman into the three-man room. The fact that Adams continued watching television, that Adams had another discussion about his issues with Uffelman with Defendant Averill and Officer McArthur (who did not separate them, either), and that Adams went to sleep afterwards further show that Defendant LeClair's decision to house the residents together was reasonable. *Id.* ¶¶ 47, 58, 74. Where a prison official "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent[,]" that official is not deliberately indifferent. *Farmer,* 511 U.S. at 844. Just as Adams "never would have thought" that Uffelman would do what he did (DSMF ¶ 73), Defendant LeClair also did not know

or disregard of a substantial risk of harm in placing Uffelman in the three-man room. Because Defendant LeClair did not act with deliberate indifference, he is entitled to summary judgment.

IV.    **Defendants Are Entitled to Immunity on Any State Law Claims.**

The Court's screening order addressed only Eighth Amendment claims (ECF No. 8 pp. 3-4), but the Complaint also references negligence. To the extent that Adams brings a negligence claim against Defendants, they are absolutely immune. Defendants are immune in their official capacities under 14 M.R.S.A. § 8103 (2021), which states that "all government entities shall be immune from suit on any and all tort claims seeking recovery of damages." The Maine Tort Claims Act provides immunity to all governmental entities (and thus also individuals sued in an official capacity) from suit on all tort claims seeking recovery for damages "except as otherwise expressly provided by statute." *New Orleans Tanker Corp. v. Dep't of Transp.*, 728 A.2d 673, 675 (Me. 1999) (citing 14 M.R.S.A. §§ 8103-8104-A). Here, there is no applicable exception to immunity under the Tort Claims Act. *See* 14 M.R.S.A. 8104-A.

If the State had obtained insurance coverage in areas in which it is immune, the State (and Defendants in their official capacities) could be liable to the limits of the insurance coverage. 14 M.R.S.A. § 8116; *Burns v. City of Augusta*, 522 A.2d 361, 362 (Me. 1987). However, it cannot be disputed that the State has not purchased commercial insurance that would provide coverage for Plaintiff's claims, and the self-insurance it procured through the State's Risk Management Division specifically excludes claims for which the State is otherwise immune. DSMF ¶¶ 95-96. Thus, immunity has been preserved. *Maynard v. Comm'r of Corr.*, 681 A.2d 19, 23-24 (Me. 1996). Because the State has not waived its immunity, Defendants in their official capacity are entitled to summary judgment on the state law claims.

Defendants Averill and LeClair are also immune in their individual capacities, because they are protected by statutory discretionary function immunity. 14 M.R.S. § 8111(1)(C) protects employees of governmental entities and makes them immune from personal civil liability for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused[.]" The statute is clear that "[t]he absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute . . . or resolve and shall be available to all governmental employees . . . who are required to exercise judgment or discretion in performing their official duties." 14 M.R.S. § 8111(1)(paragraph after subsection F). Here, there is no dispute that Defendants had discretion over where to house infirmary residents. Thus, Defendants are immune from any negligence claim.[12] *Grossman v. Richards*, 722 A.2d 371, 373-74 (Me. 1999) (affirming discretionary function immunity where the officer's duties "reasonably encompassed" his conduct). Defendants are thus immune and entitled to judgment on Adams' negligence claim.

## V.   Defendants Are Entitled to Qualified Immunity.

Adams' Complaint only seeks damages and a declaration that Adams' rights were violated. (ECF No. 1-1 pp. 13-14.) Defendants are entitled to qualified immunity from all damages claims, because they did not violate Adams' constitutional rights (as discussed above), and because Defendants would not have been on notice that their conduct violated clearly established law. *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015).[13]

---

[12] Defendants LeClair and Averill are also protected by the immunity given to "intentional act[s] or omissions[s] within the course and scope of employment" so long as the acts are not in bad faith. 14 M.R.S. § 8111(1)(E); *Grossman,* 722 A.2d at 375. There is no evidence that either defendant acted in bad faith. *Id.*

[13] To defeat qualified immunity, there must be "controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal

Even if there had been a constitutional violation, the conduct at issue does not implicate any clearly established right. *Id.* at 611. Where prison officials are assessing a variety of factors to determine resident safety and Defendants act reasonably, but another resident harms the plaintiff, the officials did not violate the Eighth Amendment, let alone clearly established law. *Burrell,* 307 F.3d at 8; *Farmer,* 511 U.S. at 844. While it is established that prison officials have a constitutional duty to protect residents from violence at the hands of other residents, *Ayala Serrano,* 909 F.2d at 14, defining the clearly established right as prison residents' right to be "free from violence at the hands of others" would define the right much too generally. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" and that "the violative nature of particular conduct" must be clearly established. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citations omitted). Here, there is no controlling precedent that would have put Defendants on notice that their conduct violated clearly established law. *See Burrell,* 307 F.3d at 8-9. Because Defendants did not violate Adams' constitutional rights or clearly established law, they are entitled to qualified immunity.

## <u>CONCLUSION</u>

Because Defendants Averill and LeClair did not know of or consciously disregard a substantial risk to Adams' safety and because Defendants are immune from any negligence claim, Defendants should be awarded summary judgment.

---

in the particular circumstances that he or she faced—then-existing precedent, in other words, must have placed the . . . question beyond debate." *Rivera-Corraliza v. Morales*, 794 F.3d 208, 214-15 (1st Cir. 2015) (cleaned up).

Dated:  July 23, 2021          Respectfully submitted,

AARON M. FREY
Attorney General of Maine

/s/ Jillian R. O'Brien
JILLIAN R. O'BRIEN, Bar No. 6225
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax: (207) 287-3145
jill.obrien@maine.gov

**ATTORNEYS FOR DEFENDANTS THOMAS AVERILL & MATTHEW LECLAIR**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2021, I electronically filed the above document with the

Clerk of Court using the CM/ECF system and mailed a copy of said document by First Class Mail,

postage prepaid to:

> Jon R. Adams
> MDOC #13557
> Maine Correctional Center
> 17 Mallison Falls Rd.
> Windham, ME 04062

/s/ Jillian R. O'Brien
JILLIAN R. O'BRIEN, Bar No. 6225
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
jill.obrien@maine.gov
