UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JON R. ADAMS, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   1:19-cv-00547-GZS |
| | ) |
| MATTHEW MAGNUSSON, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, formerly in custody at the Maine State Prison, alleges that Defendants failed to protect him from harm inflicted by another person in custody while he was assigned to the prison. (Amended Complaint, ECF No. 75.) Plaintiff moves for partial summary judgment on the issue of Defendants' liability (Motion, ECF No. 106), and Defendants Thomas Averill and Matthew LeClair move for summary judgment on Plaintiff's claims.[1] (Motion, ECF No. 108.)

Following a review of the summary judgment record and after consideration of the parties' arguments, I recommend the Court deny Plaintiff's motion for partial summary judgment and deny Defendants' motion for summary judgment.

---

[1] Defendants Averill and LeClair are the only remaining defendants. (*See* Recommended Decision after Review of Plaintiff's Complaint, ECF No. 8; Order Affirming the Recommended Decision, ECF No. 12.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).[2]

---

[2] "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

## FACTUAL BACKGROUND

In 2019, Plaintiff was in the custody of the Maine Department of Corrections (MDOC).[3] (Defendants' Statement of Material Facts (DSMF) ¶ 1, ECF No. 109.) Defendant LeClair is an officer assigned to the infirmary at Maine State Prison (MSP), and he worked in the infirmary in 2019. (*Id.* ¶ 2.) Defendant Averill is also employed by MDOC at MSP, and in September 2019, he was employed as a Correctional Sergeant assigned to the infirmary and other units. (*Id.* ¶ 3.)

In August 2019, Plaintiff was in the infirmary at MSP due to serious injuries he sustained when he jumped off the second tier railing at the Maine Correctional Center.[4] (Plaintiff's Statement of Undisputed Facts (PSUF) ¶ 2; ECF No. 106-5; DSMF ¶¶ 4, 5.) Individuals who need more medical care than can be provided in the housing units are placed in the infirmary. (DSMF ¶ 7.) The infirmary consists of one three-person room and four single rooms, and thus the maximum capacity of the infirmary is seven. (*Id.* ¶ 8.) The three-person room in the infirmary, where Plaintiff was residing when the relevant events occurred, is a large room with three hospital beds. (*Id.* ¶ 9; *see* PSUF ¶ 3.)

Each person in the infirmary has a television. (DSMF ¶ 10.) To avoid the sound of one person's television disturbing another individual in the three-person room, each individual residing in the room has headphones. (*Id.* ¶ 11.)

---

[3] Plaintiff was released from custody in August 2021. (*See* Defendants' Statement Regarding ECF No. 130 & Notice Regarding Plaintiff's Address, ECF No. 139.)

[4] After his discharge from the hospital, Plaintiff was transported to the MSP infirmary medical unit for recovery and physical therapy. (PSUF ¶ 2.)

On August 26, 2019, Richard Uffelman was moved into Plaintiff's three-person room.[5] (PSUF ¶ 4.) Shortly after Uffelman was moved into the room, a disagreement arose between Plaintiff and Uffelman, who accused Plaintiff of stealing his headphones. (DSMF ¶ 14.) Uffelman approached one of the officers working in the infirmary and repeated his allegation against Plaintiff. (*Id.*) The officer noted the accusation in an entry he made in MDOC's computerized offender information system (CORIS); the system also reflects the officer verified that the headphones Plaintiff had were a pair the nurse had given him. (*Id.* ¶¶ 14-15.)

Uffelman later informed a nurse working in the infirmary that Plaintiff "is a 'Cell Thief and I [Uffelman] am going to kill him.'" (*Id.* ¶ 17.) The statement was noted in another of the CORIS entries, made about a half-hour after the first entry. (*Id.*) Uffelman also reported to the nurse that Plaintiff asked him if he (Plaintiff) should sleep with one eye open, to which Uffelman responded, "Yes." (*Id.* ¶ 18.) Uffelman's conversation with the nurse was noted in the officer's report, who also made a handwritten entry in the logbook for the infirmary stating, "I/M Uff[el]man … accuse[es] [Plaintiff] of stealing headphones." (*Id.* ¶ 19; PSUF ¶ 6.) Officers subsequently removed Uffelman from the three-person room. (*Id.* ¶ 20.)

MDOC has a process by which a person in custody can make a request, known as a "keep separate," to keep the person separate from another person in custody because of safety concerns. (*Id.* ¶ 23.) When a "keep separate" is entered into the CORIS system, a

---

[5] Uffelman was serving a life sentence for murder. (PSUF ¶ 5.)

4

flag indicates that there is a conflict between two individuals and that they are not to reside in the same unit. (Declaration of Matthew LeClair ¶¶ 23, 26, ECF No. 110.) After the requesting person completes the request form, prison officials investigate the request closely to prevent the person from manipulating the process. (DSMF ¶¶ 23, 25, 26.) Although Plaintiff previously had requested a "keep separate" for other individuals, he did not submit a "keep separate" for Uffelman after the August 26 encounter.[6] (*Id.* ¶¶ 28, 29.)

On September 14, 2019, Defendant LeClair was working in the infirmary. (*Id.* ¶ 32.) Because the three single rooms were occupied, to accommodate the medical needs of another person returning from a hospital, Defendant LeClair moved Uffelman from a single room to the three-person room Plaintiff occupied. (*Id.* ¶¶ 33, 34.) According to Defendant LeClair, Uffelman was the only occupant of a single room who was appropriate to reside with others.[7] (*Id.* ¶ 34.) Defendant LeClair also states that he had never observed Uffelman be aggressive or assaultive toward another person in custody.[8] (Declaration of Matthew LeClair in Opposition to Plaintiff's Motion for Summary Judgment ¶ 13, ECF No. 138.)

---

[6] Plaintiff submitted a "keep separate" against Uffelman after the September 14, 2019, incident, described *infra*, which MSP put in place so that Plaintiff and Uffelman would not be in the same housing unit going forward. (DSMF ¶ 24.)

[7] The other two individuals in single rooms could not be moved to the three-person room because, according to Defendant LeClair, "their custody level dictated that they could not have a roommate, or because they were not able to safely interact with other residents." (Declaration of Matthew LeClair ¶ 22.)

[8] Defendant LeClair further asserts that although he never observed Uffelman being aggressive or violent with staff, Defendant LeClair did have a confrontation with Uffelman over the removal of food from Uffelman's single room. (Declaration of Matthew LeClair in Opposition to Plaintiff's Motion for Summary Judgment ¶ 14, ECF No. 138.) Uffelman rose from his wheelchair and told Defendant LeClair that he would not let him remove the food. (*Id.*) Defendant LeClair states that he explained to Uffelman that excess food was against infirmary rules, and Uffelman backed down. (*Id.*) Defendant LeClair also states that in his experience, "the crime a resident was convicted of (even murder) is not a reliable indicator of the potential danger they pose in prison." (*Id.* at ¶ 10.) According to Defendant LeClair, some individuals at

5

Defendant LeClair told Plaintiff and the other individual assigned to the three-person room that Uffelman would be moved to the empty bed in the three-person room. (DSMF ¶ 35.) Plaintiff objected to the move. (*Id.* ¶ 36; PSUF ¶ 9.) Plaintiff asserts he told Defendant LeClair that Uffelman had previously threatened to kill him and that moving Uffelman into the room "would not be a safe situation" for Plaintiff. (Affidavit of Jon Adams in Response to Defendants' Motion for Summary Judgment (Adams Aff.) ¶ 20, ECF No. 135.) Plaintiff also represents that he informed Defendant LeClair that there was a CORIS entry regarding the August 26 incident. (Adams Aff. ¶ 19.) Defendant LeClair denies Plaintiff informed him of the incident and asserts he was unaware of the CORIS entry or the August 26 threat to Plaintiff's life. (DSMF ¶¶ 37-38.) Defendant LeClair contends that had Plaintiff informed him of Uffelman's prior threat, he would have investigated further and, if he found the threat serious, he would have put Plaintiff and/or Uffelman on "emergency observation status" (that is, alone and secure in a single cell), or taken one or both of them to another unit or segregation to ensure their safety. (*Id.* ¶ 38.)

Before moving Uffelman into the room, Defendant LeClair looked at the "conflicts" section of CORIS for Plaintiff on September 14 and observed there was no "keep separate" between Plaintiff and Uffelman.[9] (*Id.* ¶¶ 28, 48.) Defendant LeClair moved Uffelman into the three-person room on September 14. (DSMF ¶ 45; PSUF ¶¶ 8, 11.) Others in custody

---

MSP "who were convicted of lesser crimes than murder will be violent if provoked, and many convicted murder[er]s … are not violent or aggressive." (*Id.*)

[9] Defendant LeClair states that "hundreds of notes" are entered into CORIS every day, documenting a variety of events at the prison. (DSMF ¶ 49.) For example, in June and July 2019, 25 CORIS notes were entered by officers pertaining to Plaintiff. (*Id.* ¶ 50.) Defendant LeClair does not read every CORIS note regarding the individuals in the infirmary. (*Id.* ¶ 51.)

who assist in the infirmary wheeled Uffelman into the room and helped him with his belongings. (DSMF ¶ 46.) Plaintiff resumed watching television after Uffelman moved into the room. (*Id.* ¶ 47.)

Defendant LeClair's shift at the infirmary ended and he left around 6:00 p.m. (*Id.* ¶ 52.) At approximately 7:00 p.m., Uffelman took headphones from the third roommate in the three-person room; Plaintiff did not like the way Uffelman took the headphones. (*Id.* ¶ 54; PSUF ¶ 13.) Plaintiff said to Uffelman, "If you're bullying him out of his headphones, please stop," and "You just tried pulling the same thing with me 19 days ago."[10] (DSMF ¶ 56.) An officer on duty in the infirmary heard the disagreement between Plaintiff and Uffelman and consulted with Defendant Averill, who suggested the officer talk to them to try to work it out. (*Id.* ¶ 57.)

Defendant Averill and the officer went to the three-person room to discuss the situation. (*Id.* ¶ 58; PSUF ¶ 13.) Plaintiff asserts he told Defendant Averill that Uffelman had threatened him on August 26 and that the threat had been logged into CORIS and the infirmary logbook. (Plaintiff's Response to DSMF ¶ 21, ECF No. 134.) Defendant Averill contends Plaintiff called Uffelman a bully but did not say anything to him about the prior threat. (DSMF ¶ 59.) Defendant Averill asserts that he attempted to mediate the headphone dispute and obtained a spare set of headphones so that each individual in the three-person room had a pair. (*Id.* ¶ 60.) Defendant Averill maintains that before he left the room, he

---

[10] An officer had borrowed the headphones from Uffelman on September 13, 2019, for use by the other individual in the room, because at that time, Uffelman was in a single room and thus did not need headphones to watch television without disturbing anyone. (*Id.* ¶ 97.)

asked Plaintiff and Uffelman if they were good, and they both indicated that they were. (*Id*. ¶ 61.) Plaintiff asserts Defendant Averill did not ask him and Uffelman if they were good, but rather Plaintiff told Defendant Averill that "this is not a safe situation," and that he feared for his life. (Plaintiff's Response to DSMF ¶ 18; PSUF ¶ 15.) Plaintiff states that he requested to be separated from Uffelman and Defendant Averill refused to separate them. (PSUF ¶ 16.) Plaintiff contends Defendant Averill told Plaintiff and Uffelman to "cut the s--t," that he was "not moving anyone at this time of night," and if he had to come back to their room, then "someone is going to seg[regation]." (Plaintiff's Response to DSMF ¶¶ 22-24.)

Plaintiff testified at deposition that he "could have taken [Defendant Averill] up on" going into segregation, but he "just wanted to finish watching [his] show and [he] still wanted to be in the room," so he "took a chance, the risk of staying in the room." (DSMF ¶¶ 71-72.) Plaintiff further testified that he thought "well, [Uffelman]'s an old man and what can he do to me," and that Plaintiff "never would have thought in a million years [Uffelman] would have did what he did." (*Id*. ¶¶ 66, 73.) In his response to Defendants' motion, Plaintiff asserts the reason he did not request to go into segregation at that time was because Defendant Averill "had just told me that he 'was not moving anyone at this time of night.'" (Plaintiff's Response to DSMF ¶ 23.)

Plaintiff fell asleep at 1:00 a.m., with his television on but his headphones off his head. (DSMF ¶ 74; PSUF ¶ 19.) At approximately 3:30 a.m., Defendant Averill and another officer responded to the three-person room and saw Uffelman in the middle of the room holding two ballpoint pens. (DSMF ¶ 75; PSUF ¶ 21.) Defendant Averill drew his

8

taser and told Uffelman to drop the pens. (DSMF ¶ 76; PSUF ¶ 21.) Uffelman complied. (*Id.*) Uffelman had stabbed Plaintiff in the face with the pens. (PSUF ¶ 20.) Plaintiff sustained multiple puncture wounds, including his right eye. (PSUF ¶¶ 22, 24.) Defendant Averill removed Uffelman from the room. (DSMF ¶ 81; PSUF ¶ 23.)

Immediately after the incident, Plaintiff stated that he had been asleep when the attack occurred. (DSMF ¶ 89.) He wondered if he had been "snoring loudly or something," and also stated, "All because I stuck up for this gentleman earlier, it has to have been." (*Id.*) When Defendant Averill asked Uffelman why he had stabbed Plaintiff, Uffelman claimed that Plaintiff had threatened Uffelman's family members. (*Id.* ¶¶ 82-83.) Uffelman agreed with Defendant Averill that Uffelman thought he and Plaintiff "were good" after Defendant Averill had spoken to them earlier in the evening. (*Id.* ¶ 85.) Plaintiff denied making the threat to Uffelman when later questioned by Defendant Averill. (*Id.* ¶ 87.) Plaintiff told Defendant Averill he did not know why Uffelman stabbed him and asked Defendant Averill why Uffelman had done it. (*Id.* ¶ 88.)

Two medical staff members evaluated Plaintiff and determined that he required treatment at a hospital emergency room. (*Id.* ¶ 90; PSUF 23.) Plaintiff was taken to the emergency room at PenBay Hospital in Rockport, Maine and then to MaineGeneral Hospital in Augusta, where he saw an eye specialist. (DSMF ¶ 91; PSUF ¶ 27.) He was discharged from Maine General later that morning and returned to the three-person room in the infirmary (from which room Uffelman had been removed). (DSMF ¶ 92.)

**DISCUSSION**

### I. Plaintiff's Eighth Amendment Claims

Pursuant to the federal civil rights statute:

Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To prevail on a claim pursuant to Section 1983, "a plaintiff must show that 'the challenged conduct [is] attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 37 (1st Cir. 2013) (quoting *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997)); *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016); *see* 42 U.S.C. §1983.

The Cruel and Unusual Punishment Clause of the Eighth Amendment, as applied to the states through the Fourteenth Amendment, imposes a duty on prison officials to protect individuals in custody from violence at the hands of others in custody. *Lakin v. Barnhart*, 758 F.3d 66, 70 (1st Cir. 2014). "That duty has its origins in the forced dependency of inmates[.]" *Giroux v. Somerset Cty.*, 178 F.3d 28, 31 (1st Cir. 1999). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed

their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

"Not 'every injury suffered by one prisoner at the hands of another … translates into constitutional liability,'" however. *Lakin*, 758 F.3d 66 at 70 (quoting *Farmer*, 511 U.S. at 834). To establish Defendants' liability, Plaintiff must show that he was

> (1) incarcerated under conditions posing a substantial risk of serious harm; and (2) the prison official accused of failing to prevent harm acted, or failed to act, with deliberate indifference to [his] health or safety. In other words, … [Plaintiff] must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) to prove a claim of deliberate indifference. The subjective standard, in turn, contains two subparts, the "deliberate" element, which assesses whether prison officials were actually aware of the risk to [Plaintiff] and the "indifference" element, which assesses wither prison officials took reasonable steps to abate the risk.

*Boland v. Bouffard*, 1:16-cv-00111-JDL, 2018 WL 3625836, at *7 (D. Me. July 20, 2018) (citations and quotation marks omitted).

Plaintiff thus must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) to prove a claim of deliberate indifference. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

A prison official cannot be found liable for deliberate indifference unless the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and drew the inference. *Farmer*, 511 U.S. at 837. Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot … be condemned as the infliction of punishment." *Id*. at 838. A factfinder may "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Burrell v. Hampshire Cty*., 307 F.3d 1, 8 (1st Cir. 2002). Officers, however, "who actually knew of a substantial risk … may be found free of liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. In addition, "prison officials may show that even if the risks were obvious to others, it was not obvious to them." *Burrell*, 307 F.3d at 8.

### A. Plaintiff's Claim Against Defendant LeClair

Plaintiff contends that upon learning Uffelman would be transferred to the room, he informed Defendant LeClair that Uffelman had threatened to kill him on August 26 as the result of a conflict, and that the incident was the noted in CORIS. Plaintiff maintains that with knowledge of the August 26 incident and threat, and Uffelman's history as a convicted murderer, Defendant LeClair acted with deliberate indifference to Plaintiff's safety in moving Uffelman back into Plaintiff's room. Defendant LeClair denies that Plaintiff told him of Uffelman's threat on Plaintiff's life, and points to the lack of a "keep separate" request from Plaintiff, Defendant's own experience with Uffelman's prior behavior toward others in custody, and Uffelman's age and health to support his contention that the record cannot support a finding of deliberate indifference.

Central to the assessment of the deliberate indifference assessment is whether Defendant LeClair was aware of the threat and appreciated the risk presented by the threat.[11] A plaintiff can satisfy the subjective component of the deliberate indifference standard through circumstantial evidence. As the Supreme Court explained in *Farmer*,

> [w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer*, 511 U.S. at 842.

Given Plaintiff's assertions regarding his communications with Defendant LeClair about his concerns about the proposed move of Uffelman to Plaintiff's room, a factfinder could reasonably conclude that Uffelman presented a serious threat to Plaintiff's safety, that Defendant LeClair was aware of the August 26 incident and threat to Plaintiff's life, that Defendant LeClair was aware the threat was documented in the CORIS entries, that the risk was known by or apparent to Defendant LeClair, and that despite the risk, Defendant LeClair moved Uffelman to Plaintiff's room. Under the circumstances, a factfinder could reasonably conclude that when Defendant LeClair moved Uffelman into Plaintiff's room, Defendant LeClair acted with deliberate indifference to Plaintiff's safety. Issues of fact, therefore, remain for trial and neither Plaintiff nor Defendant LeClair is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

---

[11] Plaintiff's comments following the September assault questioning why Uffelman attacked him are relevant to, but not dispositive of, the question of deliberate indifference.

**B. Plaintiff's Claim Against Defendant Averill**

Plaintiff argues that Defendant Averill was deliberately indifferent to Plaintiff's safety by permitting Plaintiff and Uffelman to remain in the same room after the headphone incident on September 14. Plaintiff contends that he informed Defendant Averill of Uffelman's prior threat against him, that the threat had been logged into CORIS and the infirmary logbook, and he asked to be placed in protective custody, but Defendant Averill refused. When asked at his deposition where he would have gone had Defendant Averill separated Plaintiff and Uffelman, Plaintiff stated he did not know, and further testified:

> A. If I had to, I would have gone to segregation if I would have had to. I just know that I expressed my concerns for my safety with him [Defendant Averill] and I asked to be put in protective custody once he said he wasn't separating us this time of night, not moving anybody this time of night. Then I said, well, put me in protective custody and he said no.
>
> Q. Did Averill say something like, if I have to come back here somebody's going to seg[regation]?
> A. Yes …. That was like the last thing he said, Jillian, before he left.
>
> Q. And that was after you asked to go to protective custody?
> A. That's correct.
>
> Q. Aren't those the same thing?
> A. Huh?
>
> Q. Wouldn't you going to protective custody be you going to seg?
> A. Yeah.
>
> Q. So I'm just trying to make sure I've got it right. You tell him please put me in protective custody…. Averill says no and then Averill says, if I have to come back here one more time, somebody's going to seg?
> A. Yup.
>
> Q. Why didn't you take him up on it? Did you say I'd like to go to seg right now or – walk me through –
> A. No, I didn't, I didn't.

> Q. Why?
> A. I just didn't…. I guess I could have but I didn't….
>                                    \*\*\*
> A. I mean when Averill said, you know, if I have to come back, someone's going to get, you know you're right. I could have taken him up on that. I didn't think of – I didn't, I just didn't, you know, because –
>                                    \*\*\*
> Q. Because you thought it would work out okay or why not?
> A. I didn't think it would work out okay but I did. I didn't know what – I didn't know what – I didn't know if something was really going to happen to me, but I – at the same time, I had a feeling something was gonna. I – I can't really explain it. I just – I could have said, you know, fine, I'll go to seg right now but I just wanted to finish watching my show and I still wanted to be in the room, you know, ultimately but – you know, and even – just like they did, you know, even I took a chance, the risk of staying in the room, you know? But they took the risk of keeping me in that room as well, you know? And ultimately at the end of the day, you know, it was a bad risk.

(Deposition Transcript (Tr.) at 71:25-75:13, ECF No. 109-1.)[12]

Defendant Averill contends that Plaintiff's statements following the incident, including that he "never would have thought in a million years [Uffelman] would have" done what he did, demonstrate that Plaintiff did not perceive Uffelman as a risk. Plaintiff's comments and perception, however, are not dispositive. The issue is whether the facts, when viewed most favorably to Plaintiff, could support a finding of deliberate indifference.

---

[12] In an affidavit filed in opposition to Defendants' motion, Plaintiff asserts that Defendant Averill also stated that he "was not moving anyone this time of night." (Plaintiff's Response to DSMF ¶ 23.) "When an interested witness has given clear answers to unambiguous questions [at deposition], he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). A deponent's revision of testimony may, however, be explained by "lapse of memory, new sources of information or other events." *Hernandez-Loring v. Univ. Metro.*, 233 F.3d 49, 54 (1st Cir. 2000). In addition, a "subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002). Plaintiff's statement in the affidavit was also contained in his original complaint and does not "clearly contradict" his most salient deposition testimony – that he told Defendant Averill of the prior threat to his life and that he feared for his safety.

While Defendant Averill disputes Plaintiff's assertion that he told Defendant Averill of Uffelman's threat, the facts, viewed most favorably to Plaintiff, are that when the September 14 confrontation between Plaintiff and Uffelman occurred, Defendant Averill was told of Uffelman's threat to Plaintiff's life approximately three weeks earlier and that the incident was documented in the CORIS entries and the infirmary logbook, that on Plaintiff's first day in the same room as Uffelman, there was a confrontation between Uffelman and Plaintiff, that Plaintiff reported he feared for his safety and asked to be separated, and that Defendant Averill took no action to separate Uffelman and Plaintiff.

Defendant Averill contends summary judgment is appropriate because after assessing the circumstances, he did not infer that Uffelman posed a substantial risk to Plaintiff's safety. Defendant thus argues that Plaintiff cannot satisfy the subjective component of the deliberate indifference standard. Defendant's assertion that he did not draw the inference is evidence to be evaluated by a factfinder but does not preclude Plaintiff from demonstrating that Defendant Averill was aware that Uffelman posed a substantial risk to Plaintiff's safety. A plaintiff may demonstrate that an officer was aware of the risk through circumstantial evidence. *Farmer*, 511 U.S. at 842.

Here, given Defendant's knowledge of Plaintiff's confrontation with Uffelman on September 14, and given Plaintiff's asserted discussion with Defendant Averill about Plaintiff's concern for his safety following his August 26 confrontation with Uffelman and Uffelman's threat to harm him, when the facts are viewed most favorably to Plaintiff, a factfinder could reasonably conclude that Defendant Averill was aware that Uffelman presented a substantial risk to Plaintiff's safety and failed to take reasonable measures (e.g.,

16

relocate Plaintiff or Uffelman) to alleviate the risk. Factual issues, therefore, remain for trial and neither Plaintiff nor Defendant Averill is entitled to summary judgment on Plaintiff's § 1983 claim.[13]

## II. Plaintiff's State Law Claim

Plaintiff asserts a negligence claim based on Defendants' failure to protect them. (Am. Compl. ¶¶ 98, 101.) Under Maine law, Defendants are immune for claims arising out of their performance of a discretionary function. 14 M.R.S. § 8111(1)(C). When a question of fact exists as to whether a governmental employee acted with deliberate indifference, the employee is not entitled to summary judgment on the state law tort claim based on the assertion of discretionary function immunity. *See e.g., Richards v. Town of Elliot*, 2001 ME 132, ¶ 780 A.2d 281 (if officer uses excessive force in executing an arrest, the action is beyond the officer's discretion); *Parlin v. Cumberland County*, 659 F. Supp. 2d 201, 214 (D. Me. 2009) (because excessive force claims proceeding to trial, defendants not entitled to summary judgment based on discretionary function immunity); *Martin v. Somerset County*, 387 F. Supp. 2d 65, 83 (D. Me. 2005) (factual issue as to whether defendant was deliberately indifferent to an one's medical needs precludes summary judgment based on discretionary function immunity).[14] Defendants, therefore, are not entitled to summary judgment on Plaintiff's state law claims.

---

[13] Defendants also argue they are entitled to qualified immunity. Defendants, however, have presented no persuasive argument or authority to support a finding that a correction officer's obligation to take reasonable measures to protect a person in custody from harm inflicted by another person in custody who threatened the life of the other person was not clearly established in 2019.

[14] Although Plaintiff frames his state law claim as one involving negligence, rather than in terms required to overcome immunity, given that summary judgment is not warranted on the deliberate indifference claims

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny Plaintiff's motion for partial summary judgment and deny Defendants' motion for summary judgment.

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 19th day of January, 2022.

---

and given the relevant Law Court and District of Maine decisions, Defendants have not persuasively explained why the state law claim should not proceed given that a pro se complaint is to be construed liberally. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007).